| | | |
|---|---|---|
| **UNITED STATES DISTRICT COURT** | | **EASTERN DISTRICT OF TEXAS** |

| | | |
|---|---|---|
| ANDREW W. CAMPBELL, M.D., Individually and d/b/a Medical Center For Immune & Toxic Disorders, | § § § § | |
| Plaintiff, | § § | |
| *versus* | § § | CIVIL ACTION NO. 1:05-CV-0273 |
| CHEVRON PHILLIPS CHEMICAL COMPANY, L.P., MEDICAL BENEFITS PLAN, | § § § § | |
| Defendant. | § § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Chevron Phillips Chemical Company, L.P., Medical Benefits Plan's (the "Chevron Plan") Motion for Summary Judgment (#71). The Chevron Plan seeks summary judgment on Plaintiff Andrew W. Campbell, M.D., individually and d/b/a Medical Center for Immune & Toxic Disorders's ("Dr. Campbell") claims that Aetna Life Insurance Company ("Aetna") abused its discretion in denying payment for medical services he provided to Theresa L. Freeman ("Mrs. Freeman") in violation of the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1132 (2005) ("ERISA"). Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that the Chevron Plan's motion should be granted.

I.    Background

Michael Freeman ("Mr. Freeman"), through his employment with Chevron Phillips Chemical Company, L.P., ("Chevron"), participated in the Chevron Phillips Chemical Company

LP Medical Plan (the "Medical Plan").  The Medical Plan is a self-funded employee benefit plan, providing medical healthcare coverage to Chevron employees and their dependents.  As Mr. Freeman's spouse, Mrs. Freeman qualifies as an eligible dependent under the terms of the Medical Plan.  Aetna Life Insurance Company ("Aetna") provides claims administration services to the Medical Plan pursuant to an Administrative Services Only Agreement (the "Services Agreement"). Additionally, according to Defendant, Aetna acts "as fiduciary solely for benefit determinations and review of denied claims for benefits under ERISA" and has "complete and final discretionary authority to interpret the plans and [to] maintain control over the operation and administration of the plans."

Mrs. Freeman experienced a myriad of health problems, including pain in her lymph nodes, recurring respiratory problems, persistent cough, shortness of breath, tingling in her hands and fingers, and loss of balance.  Mrs. Freeman's primary care physician referred her to Dr. Campbell, a medical provider outside of Aetna's network, who renders medical treatment and services for immune and toxicological disorders.  According to Defendant, Dr. Campbell specializes in the detection and treatment of illnesses such as chronic fatigue syndrome and sick building syndrome.

The Chevron Plan claims that, before Mrs. Freeman's initial office visit with Dr. Campbell, Aetna received a telephone call attempting to verify her coverage under the Medical Plan.  Defendant alleges that Aetna informed Dr. Campbell's office that Mrs. Freeman's medical coverage did not generally include out-of-network benefits for the services he was planning to provide.  The Chevron Plan notes that because Aetna does not have a specialist within its network for the treatment of toxic and immune disorders, the Medical Plan allows for limited out-of-

2

network claims with the understanding that benefit reimbursement is subject to the Medical Plan's coverage provisions and Aetna's review for medical necessity.

During her first office visit on August 9, 2001, Mrs. Freeman informed Dr. Campbell that she believed mold existed at her place of employment. After a physical examination and blood studies, Dr. Campbell diagnosed Mrs. Freeman with a "building related illness" attributed to toxic mold. According to Dr. Campbell, the test results indicated that Mrs. Freeman had "an abnormally low, natural killer cell activity which indicated a depressed immune system and had extraordinarily abnormal levels of immunoglobulin that fight a number of toxic molds, including stachybotrys, histoplasma, coccidides, candida, and pullularia pullulans." In an attempt to restore her immune system to normal levels, Dr. Campbell wrote Mrs. Freeman a prescription for intravenous immunoglobulin ("IVIG") infusion treatments.

Defendant alleges that, in connection with these services, Aetna received a telephone call from Gentiva Health Services ("Gentiva"), a participating provider within the Aetna network, seeking to verify Mrs. Freeman's coverage for home healthcare and monthly home IVIG infusion treatments. According to the Chevron Plan, Aetna advised Gentiva's representative that Mrs. Freeman's home healthcare was payable at 100%, subject to the Medical Plan's coverage provisions, including the determination of medical necessity of the prescribed treatments, and that any requested treatments required pre-certification by Aetna.

Mrs. Freeman continued to receive follow-up diagnostic services from Dr. Campbell and IVIG treatments from Gentiva between September 5, 2001, and July 15, 2003. Dr. Campbell submitted claims for benefits under the Medical Plan seeking reimbursement for the services he rendered. Aetna processed the claims submitted for Mrs. Freeman's diagnostic testing and paid

3

benefits pursuant to its interpretation of the terms of the Medical Plan.  Aetna denied a majority of the charges submitted by Dr. Campbell because it determined that the services he provided to Mrs. Freeman were not medically necessary and, thus, not covered by the Medical Plan.

Dr. Campbell initiated the appeals process via a written request to Aetna on June 17, 2002.  Aetna's reimbursement decisions regarding Mrs. Freeman's diagnostic testing and treatment were reviewed by four medical professionals.  Defendant maintains that after analyzing Mrs. Freeman's available medical records, Aetna's medical examiners concluded that the majority of the benefits requested by Dr. Campbell were not medically necessary, and therefore, were not covered under the Medical Plan.  Dr. Campbell asserts that the denial of these reimbursements was arbitrary and capricious.  Defendant contends that Aetna's benefits determination was legally correct under the terms of the Medical Plan and did not constitute an abuse of discretion.

In March 2005, the Freemans filed suit against Aetna, asserting state law claims arising out of Aetna's denial of benefits.  On April 8, 2005, Aetna removed the case to this court on the basis of federal question jurisdiction.  The Freemans subsequently amended their complaint to assert an ERISA claim, arguing that Aetna improperly denied medical benefits payable under the Medical Plan.  The Freemans sought to recover benefits purportedly due them under the Medical Plan, to enforce their rights under the Medical Plan, and to clarify their rights to future benefits under the terms of the Medical Plan.

Aetna filed a third-party complaint against Dr. Campbell on September 1, 2005, seeking declaratory relief.  On September 21, 2005, Dr. Campbell filed a counterclaim against Aetna.  Dr. Campbell then filed cross-claims against the Freemans on December 6, 2005, for breach of contract.  On January 6, 2006, Dr. Campbell filed a third-party complaint against the Chevron

4

Plan seeking reimbursement for his testing and treatment of Mrs. Freeman.  In accordance with joint stipulations filed by the parties, the court dismissed Dr. Campbell's counterclaim against Aetna, Dr. Campbell's cross-claims against the Freemans, Aetna's third-party claims against Dr. Campbell, and the Freemans' claims against Aetna.  On June 15, 2006, the Chevron Plan filed the instant motion seeking summary judgment on all claims asserted by Dr. Campbell.

II.    Analysis

  A.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

"A fact is '*material*' if it '*might affect* the outcome of the suit under governing law.'" *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248); *see Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th

5

Cir. 2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001); *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999); *Burgos v. Southwestern Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir. 1994). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan*, 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord EMCASCO Ins. Co. v. American Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006); *Cooper Tire & Rubber Co.*, 423 F.3d at 454; *Harken Exploration Co.*, 261 F.3d at 471; *Merritt-Campbell, Inc.*, 164 F.3d at 961. The moving party, however, need not negate the elements of the nonmovant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322 n.3 (citing FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004); *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003); *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000). "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587); *see Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996); *see Reeves*, 530 U.S. at 150; *Lincoln Gen. Ins. Co.*, 401 F.3d at 350; *Smith ex rel. Estate of Smith*, 391 F.3d at 624; *Malacara*, 353 F.3d at 398; *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003); *Harken Exploration Co.*, 261 F.3d at 471; *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir.), *cert. denied*, 534 U.S. 951 (2001). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n.5 (1990) (citing *Anderson*, 477 U.S. at 255); *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004); *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003); *Martinez*, 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir.), *cert. denied*, 540 U.S. 815 (2003); *Chaplin v. Nationscredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002). The evidence is construed "in favor of the nonmoving party, however, only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999); *accord Boudreaux*, 402 F.3d at 540; *Little*, 37 F.3d at 1075 (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Moreover, "'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989)). "If the [nonmoving party's] theory is . . . senseless, no

reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468-69. The nonmovant's burden is not satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions," by speculation, by the mere existence of some alleged factual dispute, or "by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (citations omitted); *see Anderson*, 477 U.S. at 247-48; *Warfield*, 436 F.3d at 557; *Boudreaux*, 402 F.3d at 540; *Wallace*, 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown*, 337 F.3d at 541; *see Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 332 (5th Cir. 2004); *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003); *Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir.), *cert. denied*, 537 U.S. 950 (2002).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *EMCASCO Ins. Co.*, 438 F.3d at 523; *Cutrera v. Board of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

B.      Existence of ERISA Plan

Dr. Campbell claims that Defendant has not tendered an ERISA plan into the administrative record conveying discretionary authority to Aetna regarding claims determinations.   He also

8

maintains that Aetna never had a copy of the plan and, consequently, denied his claims without reference to specific plan provisions.  Dr. Campbell argues that the absence of a plan in the administrative record indicates that there is no plan for purposes of ERISA, and, therefore, the court lacks jurisdiction over this matter.

Defendant maintains that the Medical Plan is set forth in Appendix A to the Chevron Phillips Chemical Company LP Health & Welfare Benefit Plan (the "Health and Welfare Benefit Plan").  Further, Defendant claims that the Health and Welfare Benefit Plan was "created to provide specified health and welfare benefits for the exclusive benefit of Covered Persons."  It asserts that the Health and Welfare Benefit Plan is an umbrella agreement containing multiple employee benefit programs.  The Health and Welfare Benefit Plan defines "benefit plan," as follows:

> [A]ny Health Plan or other employee benefits program as set out in the Appendices . . . .  The terms of each Benefit Plan, as they may be set out in Insurance Policies, Administrative Service Agreements or other documents, shall form a part of this Plan in the same manner as if all the terms and provisions thereto were included herein.  Terms of such Benefit Plans, including (as applicable) the amount payable, required Deductibles, copayments, benefit maximums, conditions precedent to payment, limitations and exclusions, and the procedures for coordinating benefits payable shall be as set forth in the applicable Appendix.

The Medical Plan, set forth in Appendix A, is a one-page document, which addresses participation eligibility and incorporates by reference the Services Agreement and the Medical Plan's summary plan description ("SPD"), entitled Summary of Health Care and Income Protection Benefits.  Specifically, the Medical Plan, as detailed in Appendix A, states:

> [T]erms governing this Medical Plan are set forth in the Medical Plan's summary plan description and in any Administrative Services Agreement or Insurance Policy which the Company or Plan Administrator may enter into for the purpose of

providing Covered Persons with medical benefits.  The terms of such summary plan descriptions, Administrative Services Agreements and/or Insurance Policy are hereby incorporated into this Medical Plan.

Other than addressing eligibility and incorporating the SPD and the Service Agreement, Appendix A does not provide any information regarding specific terms and conditions of the Medical Plan.

Dr. Campbell argues that, while an SPD is helpful to the beneficiaries of the plan and can serve as notice of a plan's general features, a summary cannot substitute for the plan itself. Nonetheless, "[p]lan descriptions in employee handbooks or otherwise distributed to employees are considered ERISA documents." *Hamilton v. Air Jamaica, Ltd.*, 750 F. Supp. 1259, 1265 (E.D. Pa. 1990), *rev'd on other grounds*, 945 F.2d 74 (3d Cir. 1991), *cert. denied*, 503 U.S. 938 (1992); *accord Alday v. Container Corp. of Am.*, 906 F.2d 660, 665 (11th Cir. 1990), *cert. denied*, 498 U.S. 1026 (1991).  Moreover, "[o]ne document can serve as both the 'summary plan description' required under 29 U.S.C. § 1022(b) and the 'written instrument' required under 29 U.S.C. § 1102(a)(1)." *Hamilton*, 750 F. Supp. at 1265; *see Alday*, 906 F.2d at 662 n.2.  Hence, "a summary plan description may serve as a 'written plan'. . . ." *Cooke v. Charter Hawley Hale Stores, Inc., Group Health Care Plan*, 1986 WL 7655, at *5 (N.D. Ill. July 2, 1986); *accord Mohalley v. Kendall Health Care Prods., Co.*, 903 F. Supp. 1530, 1535-36 (M.D. Ga. 1995). Furthermore, the terms of an ERISA SPD are binding.  *See Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991).  Courts have consistently held that SPDs are controlling when in conflict with other documents, including the plan itself.  *See id.*; *see also McCall v. Burlington N./Santa Fe Co.*, 237 F.3d 506, 512 (5th Cir. 2000); *Alday*, 906 F.2d at 665-66; *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907-08 (2d Cir. 1990); *Edwards v. State Farm Mut. Auto Ins. Co.*, 851 F.2d

134, 136 (6th Cir. 1988); *Santiago Rolon v. Chase Manhattan Bank*, 912 F. Supp. 19, 22 (D.P.R. 1996).

Contrary to Dr. Campbell's assertion that the SPD is merely a summary of the Medical Plan, in this instance, it actually contains the terms and conditions governing the health care benefits available to the Freemans. While the court recognizes that a 152-page "summary" of a one-page document sounds illogical and that Defendant's nomenclature may be somewhat misleading, the SPD is sufficiently comprehensive to apprise the Freemans and Dr. Campbell of their rights and obligations under the Medical Plan. The parties have stipulated that the SPD and the Services Agreement are included in the administrative record. Presumably, therefore, Aetna had these documents in its possession when making the determination regarding the medical necessity of the claims at issue here. Furthermore, the SPD "provides information about the eligibility requirements, enrollment procedures, when coverage begins and ends, and when coverage may be continued under the various options available." Among other things, the SPD devotes over fifteen pages to classifying specific expenses as either "covered" or "not covered." The SPD also supplies information about participating providers and details information on how one may determine whether a particular physician participates in the Aetna network. If a beneficiary has additional questions regarding in-network doctors and hospitals, the SPD refers the beneficiary to his/her provider directory, to a toll-free number, or to the Aenta website at http://www.aetnaushc.com.

For purposes of ERISA, an "employee welfare benefit plan" is defined as:

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the

11

purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits . . . .

29 U.S.C. § 1002(1); *see also California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 322 n.2 (1997); *Tango Transp. v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 891 (5th Cir. 2003); *McNeil v. Time Ins. Co.*, 205 F.3d 179, 189 (5th Cir. 2000), *cert. denied*, 531 U.S. 1191 (2001); *Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 408 (9th Cir.), *cert. denied*, 516 U.S. 942 (1995); *Madonia v. Blue Cross & Blue Shield of Va.*, 11 F.3d 444, 446 (4th Cir. 1993), *cert. denied*, 511 U.S. 1019 (1994); *Meredith v. Time Ins. Co.*, 980 F.2d 352, 354 (5th Cir. 1993).

The United States Court of Appeals for the Fifth Circuit has "devised a comprehensive test for determining whether a particular plan qualifies as an 'employee welfare benefit plan.'" *Id.* at 355. Under this test, a court must ascertain "whether a plan (1) exists; (2) falls within the safe-harbor provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA 'employee benefit plan'—establishment or maintenance by an employer intending to benefit employees." *Id.* "At the outset, any court confronted with the question 'whether a particular arrangement constitutes an employee welfare benefit plan under ERISA "must first satisfy itself that there is in fact a plan at all."'" *Id.* (quoting *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 183 (5th Cir.), *cert. denied*, 506 U.S. 861 (1992) (quoting *Hansen*, 940 F.2d at 977)); *see Madonia*, 11 F.3d at 446–47. "'In determining whether a plan . . . [exists,] a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and

12

procedures for receiving benefits.'" *Meredith*, 980 F.2d at 355 (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)); *accord Madonia*, 11 F.3d at 447.

In this case, a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits from the SPD. The beneficiaries are eligible employees of Chevron and their dependents, as outlined in the SPD. Chevron and its employees share in the cost of health care coverage under the Medical Plan. Additionally, the procedures for recovering benefits are explained in the SPD, which is issued to each employee-participant. Accordingly, the Medical Plan, as detailed in the SPD, satisfies the first prong of the test to determine if a plan exists under ERISA. *See Peterson*, 48 F.3d at 408; *Madonia*, 11 F.3d at 447.

Next, if the Medical Plan satisfies the four criteria contained in 29 C.F.R. § 2510.3-1(j)(1)-(4), then it falls within the safe-harbor provision promulgated by the United States Department of Labor and is exempt from ERISA's coverage. *See Meredith*, 980 F.2d at 355; *Gahn v. Allstate Life Ins. Co.*, 926 F.2d 1449, 1452 (5th Cir. 1991). A plan comes within the exemption and is not an ERISA plan if: (1) the employer does not contribute to the plan; (2) participation is voluntary; (3) the employer's role is limited to collecting premiums and remitting them to the insurer; and (4) the employer receives no profit from the plan. *See* 29 C.F.R. § 2510.3-1(j)(1)-(4) (2006); *Meredith*, 980 F.2d at 355. The Medical Plan must satisfy all four criteria to be exempt. Here, the medical benefits available under the Medical Plan are self-funded by contributions from the employees and Chevron. Thus, because the Medical Plan fails the first prong of the test, the safe-harbor provision does not apply, and the Medical Plan is not exempted from ERISA under the federal regulations.

13

The final inquiry is whether the employer "established or maintained" the plan for the purpose of providing benefits to its employees.  *See McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 236 (5th Cir. 1995), *cert. denied*, 516 U.S. 1174 (1996); *Hansen*, 940 F.2d at 977. When determining "whether an employer 'established or maintained' an employee benefit plan, 'the court should [focus] on the employer . . . and [its] involvement with the administration of the plan.'"  *Id.* at 978 (quoting *Gahn*, 926 F.2d at 1452).  "In addition to some meaningful degree of participation by the employer in the creation or administration of the plan, the statute requires that the employer have a purpose to provide health insurance, accident insurance, or other specified types of benefits to its employees."  *Id.* (citing 29 U.S.C. § 1002(1)).  When considering whether the employer has "established or maintained" the plan, the court must analyze whether the employer purchased the insurance, selected the benefits, identified the employee participants, and distributed enrollment and claim forms.  *See McDonald*, 60 F.3d at 236.  Evaluated under these standards, the Medical Plan, as detailed in the SPD, qualifies as an ERISA plan.  Defendant maintains that it has "established or maintained" the Medical Plan for the purpose of providing benefits for eligible employees and their dependents.  Defendant has participated in the creation and administration of the Medical Plan by selecting the benefits and identifying the employee-participants.  Moreover, the SPD affirmatively states that the Medical Plan is covered under ERISA and advises employee-participants of their rights under ERISA.

In light of the fact that an ERISA plan exists in this case and the relevant documents are included in the administrative record, as stipulated by the parties, this court has subject matter jurisdiction over this action.  Indeed, a review of the record reveals that Dr. Campbell has recognized on several occasions that this matter is governed by ERISA.  For example, in his third-

party complaint, Dr. Campbell identifies Defendant as "a Delaware limited partnership, under

ERISA, 29 U.S.C. § 1001, *et seq.* . . . ." He alleges that the court has jurisdiction of this matter

because of federal questions raised by "claims under 29 U.S.C. § 1001, 1132(a), *et seq.*, for

violations of the Employee Retirement Income Security Act (ERISA)." Further, in Dr.

Campbell's amended motion for summary judgment against the Chevron Plan and Aetna, he states

that "[t]here is no question fact [sic] that ERISA governs the benefits at issue."

        C.      <u>Procedural Challenges to Aetna's Review</u>

       Dr. Campbell alleges that Aetna failed to comply with ERISA's notice requirements.

Specifically, Dr. Campbell argues that Aetna's denial of both the initial claims and the appeals

were vague and conclusory, as they failed to reference specific plan provisions and did not provide

specific reasons for the denial of benefits.

       The United States Supreme Court has stated that "ERISA was enacted 'to promote the

interests of employees and their beneficiaries in employee benefit plans' and 'to protect

contractually defined benefits.'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113

(1989) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); *Massachusetts Mut. Life

Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985)). Hence, certain minimum requirements for

procedures and notification have been set forth for situations in which a plan administrator denies

a claim for benefits. *See Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998)

(citing *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir. 1992)). ERISA provides:

> [E]very employee benefit plan shall (1) provide adequate notice in writing to any
> participant or beneficiary whose claim for benefits under the plan has been denied,
> setting forth the specific reasons for such denial, written in a manner calculated to
> be understood by the participant, and (2) afford a reasonable opportunity to any

participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

In furtherance of these requirements, the United States Department of Labor has promulgated regulations governing the notice a claimant must receive for a denial of benefits, which should include the following information:

(i) The specific reason or reasons for the adverse determination; (ii) Reference to the specific plan provisions on which the determination is based; (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; (iv) A description of the plan's review procedures and the time limits applicable to such proceedings, including a statement of the claimant's right to bring a civil action under 502(a) of the Act following an adverse benefit determination on review . . . .

29 C.F.R. § 2560.503-1(g). The regulations further require plans to provide an internal appeals process, whereby each "claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." *Id.* at § 2560.503-1(h).

The Fifth Circuit has held that not all procedural defects in denial notifications under ERISA will invalidate a plan administrator's decision; substantial compliance with the spirit of the regulation will suffice. *See Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392 (5th Cir. 2006); *see also Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 257 (5th Cir. 2005). Further, substantial compliance means that "'[t]echnical noncompliance' with ERISA procedures 'will be excused' so long as the purposes of section 1133 have been fulfilled." *Robinson*, 443 F.3d at 393 (quoting *White v. Aetna Life Ins. Co.*, 210 F.3d 412, 414 (D.C. Cir. 2000)).

16

The administrative record contains a series of Explanation of Benefits ("EOB") forms issued by Aetna corresponding to the dates on which Dr. Campbell rendered services to Mrs. Freeman.   The EOB's informed Dr. Campbell of the specific reasons for the denial of reimbursement and provided sufficient information on how to proceed with an appeal.   The EOB's itemize the dates and services provided to Mrs. Freeman.   Next to each line item is a remark code that represents a detailed explanation of Aetna's benefit determination.   The EOB's refer the recipient to the reverse side for a definition of each remark code found on the face of the document.   The relevant remark codes listed on the EOB's forwarded to Dr. Campbell include:

A.   Expenses are not payable due to Employer Plan Provisions:
    1.   Plan maximum or not covered under plan's provisions.

G.   These expenses appear to be a duplicate of previously submitted expenses.

J.   Expenses are not payable due to plan benefit limitations and/or services not considered necessary for treatment of the illness or injury.

The EOB's sent to Dr. Campbell also advised him that "[i]f you have any questions about the individual's claim listed below, please contact the appropriate issuing service center." The EOB's further supplied Dr. Campbell the appropriate issuing service center's address and telephone number.

In any event, Dr. Campbell received notice of the denials of the claims and sought Aetna's review of its decisions.   Indeed, as indicated from the voluminous records submitted to the court, Dr. Campbell availed himself of the appeals process.   Thus, the denial notices Dr. Campbell received substantially complied with applicable regulations.

Department of Labor regulations require that a review procedure be established to allow a claimant or his or her representative to make a timely appeal of any adverse claim decision; to

17

submit documents related to the claim; to provide reasonable access to documents and records that form the basis of decision; and to provide for a thorough review considering all comments, documents, records, and other information submitted by the claimant. *See* 29 C.F.R. § 2560.503-1(h)(2). In this case, the SPD details the "Claim Review Procedure" established by the Medical Plan. This review procedure provides that, upon receipt of written notification of a denial of benefits, a claimant or his or her authorized representative may "submit a written request to the plan administrator for review of the denial," "look at relevant documents," and "submit issues and comments in writing." Subsequently, a review of the benefit decision will be conducted, and a decision will be made. The SPD then requires that a claimant "receive a copy of the decision, in writing, including the specific reasons . . . and reference to the plan provision(s) on which it is based."

During the course of the nearly six-month appeals process related to Dr. Campbell's requests for coverage and reimbursement, the regulation requirements were substantially satisfied. On June 17, 2002, Dr. Campbell initiated the appeals process. An Aetna medical director, James Buckman, M.D. ("Dr. Buckman"), conducted the first level review. At the conclusion of Dr. Buckman's review, Aetna notified Dr. Campbell of its decision via a letter dated August 28, 2002. Dr. Buckman's letter detailed the clinical information provided to him and concluded that Mrs. Freeman's condition did not appear to warrant the diagnostic treatment and associated services provided by Dr. Campbell. The letter further referenced the medical necessity provisions of the Medical Plan, furnished a web address that discusses Aetna's medical necessity criteria for IVIG treatment, and supplied instructions on how to obtain free copies of all documents, records, and

18

other information relevant to the denied claims.  Moreover, Dr. Buckman's letter imparted how to appeal Aetna's determination within 60 days from receipt of the letter.

An additional appeal was initiated, and a second level review of the denied claims was conducted by two separate physicians, Kent C. Holtzmuller, M.D. ("Dr. Holtzmuller"), and an Aetna Senior Medical Director, Kenneth M. Robbins, M.D. ("Dr. Robbins").  Dr. Holtzmuller was an independent medical consultant who certified that his affiliation with Aetna "at no time constituted more than five percent of [his] gross annual income."  Both Dr. Holtzmuller and Dr. Robbins agreed with Aetna's original claims denial and first level appeal decision.  Dr. Campbell received notice of the rejection of the second level appeal via a letter dated October 2, 2002.  Again, the letter explained that coverage was being denied, set forth the specific reasons why coverage was being refused, and provided instructions on how to obtain free copies of all documents, records, and other information relevant to the denied claims.

Dr. Campbell does not claim that he did not receive these letters explaining the disposition of his appeals.  The numerous communications between Aetna and Dr. Campbell demonstrate that the Medical Plan "establish[ed] and maintain[ed] a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to [Aetna], and under which there will be full and fair review of the claim and the adverse benefit determination."  29 C.F.R. § 2560.503-1(h)(1).  Consequently, it is apparent that Defendant complied with the spirit and intent of ERISA's full and fair review procedures.  *See Robinson*, 443 F.3d at 392; *Lacy*, 405 F.3d at 257.  Therefore, the responses Dr. Campbell received regarding the denial of his claims complied with the requirements of ERISA.  *See id.*

D.    Standard of Review

The parties dispute the appropriate standard of review under which this court should evaluate Aetna's decision to deny Dr. Campbell's claims.  Dr. Campbell argues that the *de novo* standard of review applies because the Medical Plan does not expressly grant Aetna complete discretion over claims determinations.  Defendant asserts, on the other hand, that the abuse of discretion standard is appropriate because Aetna is granted full discretionary authority to determine eligibility for benefits and to construe the terms of the Medical Plan.  Additionally, Defendant contends that Aetna's decision regarding the medical necessity of Dr. Campbell's services is a factual determination, which is subject to abuse of discretion review.

Under ERISA, an administrator's interpretation or application of the plan, including a denial of plan benefits challenged under 29 U.S.C. § 1132(a)(1)(B), is reviewed utilizing the *de novo* standard of review "unless the benefit plan expressly gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms." *Firestone Tire & Rubber Co.*, 489 U.S. at 102.  When an employee benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a reviewing court must evaluate the plan administrator's decision under an abuse of discretion standard.  *See id*. at 115; *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 269 (5th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S. Ct. 2941 (2005); *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 225 (5th Cir. 2004); *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 342 (5th Cir. 2002); *Aboul-Fetouh v. Employee Benefits Comm.*, 245 F.3d 465, 472 (5th Cir. 2001).

A court cannot imply an administrator's discretionary authority to determine eligibility for benefits or to construe the terms of the plan "'unless the plan language expressly confers such authority on the administrator.'" *Chevron Chem. Co. v. Oil, Chem. & Atomic Workers Local Union 4-447*, 47 F.3d 139, 142 (5th Cir. 1995) (quoting *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 636 (5th Cir. 1992)); *see Lynd v. Reliance Standard Life Ins. Co.*, 94 F.3d 979, 981 (5th Cir. 1996) (observing that "the requisite grant of discretionary authority cannot be inferred from the language of an ERISA plan"); *Cathey v. Dow Chem. Co. Med. Care Program*, 907 F.2d 554, 559 (5th Cir. 1990), *cert. denied*, 498 U.S. 1087 (1991) (noting that "[a]bsent an *express* grant of discretion over entitlement determinations, the deferential review operates adversely . . . to 'afford less protection to employees and their beneficiaries'") (emphasis in original) (quoting *Firestone Tire & Rubber Co.*, 489 U.S. at 114). The Fifth Circuit has not required specific words to empower a plan administrator with discretion. *See Wildbur*, 974 F.2d at 637. Instead, courts focus on the breadth of the administrator's power conferred from the language of the plan to determine whether discretionary authority has been granted to the administrator. *See id.* (noting that the focus on determining whether plan administrators have been granted discretion to interpret the terms of a plan should be on "the breadth of the administrators' power–their 'authority to determine eligibility for benefits or to construe the terms of the plan'" and not on an "incantation of the word 'discretion' or any other 'magic word'") (quoting *Block v. Pitney Bowes Inc.*, 952 F.2d 1450, 1452-53 (D.C. Cir. 1992)); *see also Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1305 (5th Cir. 1994); *Alcorn v. Sterling Chems. Inc. Med. Benefits Plan for Hourly-Paid Employees*, 991 F. Supp. 609, 613 (S.D. Tex. 1998), *aff'd*, 168 F.3d 211 (5th Cir. 1999). To confer discretionary authority, a plan should, at the very least, convey that the plan administrator is empowered to

21

construe, to interpret, or to otherwise exercise discretion in determinations of plan members'
eligibility for benefits.  *See Cathey*, 907 F.2d at 559-60; *see also Tolson v. Avondale Indus., Inc.*,
141 F.3d 604, 607 (5th Cir. 1998) (finding that an administrator has discretionary authority where
a plan permits it "to grant and/or deny any and all claims for benefits, and construe any and all
issues of Plan interpretation and/or facts or issues relating to eligibility for benefits"); *Batchelor
v. Int'l Bhd. of Elec. Workers Local 861 Pension & Ret. Fund*, 877 F.2d 441, 442-43 (5th Cir.
1989) (finding discretionary authority where the trustees of a plan were bestowed with "full and
exclusive authority to determine all questions of coverage and eligibility" and authority "to
interpret the Plan").

Defendant maintains that the plan documents vest Aetna with the discretionary authority
to interpret and in effect to perform day-to-day claims administration for the Medical Plan.
Pursuant to the Services Agreement, incorporated into the Medical Plan, Defendant engaged Aetna
to provide claims administrative services, including "acting as fiduciary solely for benefit
determinations and review of denied claims for benefits under ERISA."  Specifically, Defendant,
via the Services Agreement, delegated to Aetna the "authority to make determinations on behalf
of [Defendant] with respect to benefit payments under the [Medical] Plan and to pay such
benefits."  Additionally, the SPD grants Aetna the discretionary authority to make determinations
concerning medical necessity.  The SPD recites that the Medical Plan "pays benefits for services
and supplies that are 'medically necessary,' as determined by Aetna, for the diagnosis, care or
treatment of an illness or injury."  Further, the SPD notes that Aetna "administers all three
medical options."  Moreover, the SPD bestows Aetna with the authority to "approve – in advance
– a course of home health care treatment . . . ." and that "it is possible that Aetna could find

22

certain services or treatments to be unnecessary [and thus not covered], even if they are recommended, prescribed or approved by [an] attending physician." Finally, the SPD vests Aetna, the Chevron Plan's designee, with "complete and final discretionary authority to interpret the plans and maintain control over the operation and administration of the plans." Accordingly, the Chevron Plan, via the Services Agreement and the SPD, delegates authority to Aetna regarding benefit eligibility for the Medical Plan.

Moreover, in this situation, Aetna made a factual determination that certain diagnostic testing and IVIG treatments were not medically necessary. "[F]actual determinations made by [an] administrator during the course of a benefits review will be rejected only upon the showing of an abuse of discretion." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999); *see also Chandler v. Hartford Life*, No. 05-50688, 2006 WL 1209363, at *3 (5th Cir. Apr. 28, 2006) (holding that "'[r]egardless of the administrator's ultimate authority to determine benefit eligibility . . . factual determinations made by the administrator during the course of a benefits review will be rejected only upon the showing of an abuse of discretion'") (quoting *Meditrust Fin. Servs. Corp.*, 168 F.3d at 213); *Vercher*, 379 F.3d at 226 (noting "that even where the plan does not expressly give the administrator discretionary authority, 'for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard'") (quoting *Pierre v. Connecticut Gen. Life Ins. Co./Life Ins. Co. of N. Am.*, 932 F.2d 1552, 1562 (5th Cir.), *cert. denied*, 502 U.S. 973 (1991)); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 598 (5th Cir. 1994) (commenting that "district courts in the Fifth Circuit review under an abuse of discretion standard a plan administrator's factual determinations . . ."); *see also*

*Schadler*, 147 F.3d at 395 (holding that an administrator's findings of fact should always be reviewed for an abuse of discretion, based on the record before the administrator).

The underlying factual determination at issue in this case is whether the diagnostic testing and related services provided by Dr. Campbell were medically necessary. The question of whether certain medical treatment is medically necessary is a question of fact. *See Meditrust Fin. Servs. Corp.*, 168 F.3d at 213-14 (finding that a plan's determination regarding medical necessity of treatment involved a review of facts rather than an issue of contract interpretation); *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996) ("decisions regarding the medical necessity of the [treatment and services] were factual determinations subject to abuse of discretion review by the district court under *Pierre*"); *Pierre*, 932 F.2d at 1559 (remarking that the "*de novo* review of factual determinations is a difficult and uncertain exercise on a cold record"); *Alcorn*, 991 F. Supp. at 614 ("whether treatment is medically necessary is clearly a question of fact") (citing *Sweatman*, 39 F.3d at 598); *Sundown Ranch, Inc. v. John Alden Life Ins. Co.*, No. Civ. A. 3:01-CV-1445, 2003 WL 21281642, at *3 (N.D. Tex. May 29, 2003) (noting that "[t]he court uses an abuse of discretion standard in reviewing factual determinations made by ERISA plan administrators, including determinations of medical necessity"); *Damare v. Occidental Petroleum Corp. Med. Care Plan*, Civ. A. No. 92-1779, 1993 WL 92503, at *2 (E.D. La. Mar. 24, 1993) (observing that "[t]he determination of whether the hysterectomy was Medically Necessary was a factual determination, not an interpretation of plan provisions"). Similarly, Aetna's decision regarding the medical necessity of the services Mrs. Freeman received from Dr. Campbell is a factual determination rather than a policy interpretation. Hence, the court will review Aetna's decision to deny a majority of the charges associated with the services and

24

treatments provided to Mrs. Freeman by Dr. Campbell under an abuse of discretion standard.  *See*

*Firestone Tire & Rubber Co.*, 489 U.S. at 115.

      E.      Aetna's Denial of Benefits for Mrs. Freeman

      In this instance, Aetna determined that a majority of the charges submitted by Dr.

Campbell were medically unnecessary and, thus, denied the payment of benefits.  Dr. Campbell

argues that Aetna acted arbitrarily and capriciously in rejecting his claims for the diagnostic testing

and related services he provided to Mrs. Freeman.

      Generally, the application of the abuse of discretion standard entails a two-step process.

*See Wildbur*, 974 F.2d at 637.  Initially, the process requires the court to "'determine the [legally]

correct interpretation of the Plan's provisions.'"  *Haubold v. Intermedics, Inc.*, 11 F.3d 1333,

1337 (5th Cir. 1994) (quoting *Batchelor*, 877 F.2d at 444); *see Lain*, 279 F.3d at 344; *Aboul-*

*Fetouh*, 245 F.3d at 472; *Whittaker v. BellSouth Telecommunications, Inc.*, 206 F.3d 532, 535

(5th Cir. 2000); *Tolson*, 141 F.3d at 608.  If the administrator has not given the plan the legally

correct interpretation, the court's second step must be to then determine whether the plan

administrator's interpretation constitutes an abuse of discretion.  *See Aboul-Fetouh*, 245 F.3d at

472; *Whittaker*, 206 F.3d at 535; *Haubold*, 11 F.3d at 1337.  "The reviewing court [, however,]

is not rigidly confined to this two-step analysis in every case."  *Duhon*, 15 F.3d at 1307; *see also*

*Alcorn*, 991 F. Supp. at 616; *Rigby v. Bayer Corp.*, 933 F. Supp. 628, 632-33 (E.D. Tex. 1996).

When "the case does not turn on sophisticated [p]lan interpretation issues, the [c]ourt is not

required to apply the two-step process."  *Alcorn*, 991 F. Supp. at 616.  Nevertheless, the

reviewing court must consider whether an abuse of discretion has occurred.  *See id*.

In determining the legally correct interpretation of a benefit plan, the court must consider: (1) whether the administrator's interpretation is consistent with a fair reading of the plan; (2) whether the administrator has given the plan a uniform construction; and (3) whether the interpretation results in any unanticipated costs to the plan. *See Ellis*, 394 F.3d at 270; *Lain*, 279 F.3d at 344; *Chevron Chem. Co.*, 47 F.3d at 145; *see also Whittaker*, 206 F.3d at 535; *Rhorer v. Raytheon Eng'rs & Constructors, Inc.*, 181 F.3d 634, 640 n.7 (5th Cir. 1999); *Haubold*, 11 F.3d at 1337. "If the administrator has applied a legally correct interpretation of the Plan, then no further inquiry is required." *Kolodzaike v. Occidental Chem. Corp.*, 88 F. Supp. 2d 745, 747 (S.D. Tex. 2000); *see Aboul-Fetouh*, 245 F.3d at 472; *Tolson*, 141 F.3d at 608; *Shelton v. Benefit Plan of Exxon Corp.*, 8 F. Supp. 2d 616, 620 (S.D. Tex. 1998), *aff'd*, 182 F.3d 915 (5th Cir. 1999), *cert. denied*, 528 U.S. 136 (2000) (citing *Chevron Chem. Co.*, 47 F.3d at 146; *Haubold*, 11 F.3d at 1341). In other words, "[i]nasmuch as the administrator made the legally correct interpretation, [the court is] not compelled to proceed to . . . determine whether the administrator's denial of benefits was an abuse of discretion because under a correct interpretation 'no abuse of discretion could have occurred.'" *Tolson*, 141 F.3d at 609 (quoting *Spacek v. Maritime Ass'n, ILA Pension Plan*, 134 F.3d 283, 292 (5th Cir. 1998); *Wildbur*, 974 F.2d at 637-38).

Here, there is no indication that the administrator has given the Medical Plan a non-uniform construction, as there is no competent summary judgment evidence that the administrator has treated similarly situated employees' claims differently. Furthermore, there is no suggestion that any unanticipated costs will result from the administrator's denial of benefits. Therefore, the court must determine whether the administrator's interpretation of the Medical Plan is fair and

reasonable.  *See Lain*, 279 F.3d at 344.   The interpretation of an ERISA plan is governed by

federal common law.  *See Provident Life & Accident Ins. Co. v. Sharpless*, 364 F.3d 634, 641 (5th

Cir. 2004); *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1452 (5th Cir. 1995).  In construing ERISA

plan provisions, the court interprets the "contract language 'in an ordinary and popular sense as

would a person of average intelligence and experience,' such that the language is given its

generally accepted meaning if there is one."  *Transitional Learning Cmty. at Galveston, Inc. v.*

*United States Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000) (quoting *Todd*, 47 F.3d

at 1451 n.1).

A review of the Medical Plan in this case demonstrates that it is straightforward in its

language.  The SPD defines "medically necessary" as follows:

> The medical plan pays benefits for services and supplies that are "medically
> necessary," as determined by Aetna, for the diagnosis, care or treatment of an
> illness or injury.  It is possible that Aetna could find certain services or treatments
> to be unnecessary, even if they are recommended, prescribed or approved by your
> attending physician.  Generally, medically necessary services are:
>
> • Consistent with the diagnosis and treatment of your condition
>
> • In accordance with the standards of good medical practice
>
> • Performed in the least costly setting required by the patient's condition
>
> • Not provided primarily for the convenience of the patient or the health care
>   provider
>
> • Not experimental, investigative or research-oriented in nature.

The plain language of the Medical Plan is such that a person of average intelligence and experience

would know that benefits are not available to an individual who submits a claim for services

27

deemed to be medically unnecessary by Aetna.   Accordingly, Aetna's interpretation of this provision of the Medical Plan is fair and reasonable.

When applying the abuse of discretion standard, the court "'analyze[s] whether the plan administrator acted arbitrarily or capriciously.'"  *Sweatman*, 39 F.3d at 601 (quoting *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir. 1992)); *see Meditrust Fin. Servs. Corp.*, 168 F.3d at 215; *Bellaire Gen. Hosp.*, 97 F.3d at 829.   "A decision is arbitrary only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'"  *Meditrust Fin. Servs. Corp.*, 168 F.3d at 215 (quoting *Bellaire Gen. Hosp.*, 97 F.3d at 828-29); *see Dowden v. Blue Cross & Blue Shield of Tex., Inc.*, 126 F.3d 641, 644 (5th Cir. 1997).

An administrator's decision to deny benefits must be "based on evidence, even if disputable, that clearly supports the basis for its denial."  *Vega v. National Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999).   "Assuming that both parties were given an opportunity to present facts to the administrator, [the court's] review of factual determinations is confined to the record available to the administrator."  *Meditrust Fin. Servs. Corp.*, 168 F.3d at 215 (citing *Wildbur*, 974 F.2d at 639); *see also Estate of Bratton v. National Union Fire Ins. Co.*, 215 F.3d 516, 522 (5th Cir. 2000).   The district court "must inquire only whether the 'record adequately supports the administrator's decision'; from that inquiry it can conclude that the administrator abused its discretion if the administrator denied the claim '[w]ithout some concrete evidence in the administrative record.'"  *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 333 (5th Cir. 2001) (quoting *Vega*, 188 F.3d at 298); *accord Robinson*, 443 F.3d at 395.   The court's review "need not be particularly complex or technical; it need only assure that the administrator's

28

decision falls somewhere on a continuum of reasonableness—even if on the low end." *Vega*, 188
F.3d at 297.

A plan administrator is not bound by a treating physician's opinion or recommendation;
rather, it may conduct an independent investigation regarding the medical necessity of a claimant's
treatment. *See Salley*, 966 F.2d at 1015.  A plan administrator's decision to deny benefits is not
an abuse of discretion simply because the administrator adopts one of two competing opinions;
therefore, Aetna's decision is not an abuse of discretion merely because it relied upon an
independent examination where the conclusion differed from Dr. Campbell's. *See Black & Decker
Disability Plan v. Nord*, 538 U.S. 822, 831 (2003); *Meditrust Fin. Servs. Corp.*, 168 F.3d at 215
n.7; *Sweatman*, 39 F.3d at 603; *Alcorn*, 991 F. Supp. at 617 (citing *Birdsell v. United Parcel
Serv. of Am., Inc.*, 94 F.3d 1130, 1133 (8th Cir. 1996)).

Dr. Campbell argues that Aetna acted arbitrarily and capriciously in denying his claims for
diagnostic services he provided to Mrs. Freeman.  Specifically, he states that his "examinations
of Mrs. Freeman and blood studies were medically necessary."  In Dr. Campbell's opinion, the
blood tests were necessary "to accurately determine the specific causes of Mrs. Freeman's
illness."  After reviewing the results of the blood studies, Dr. Campbell concluded that Mrs.
Freeman had a depressed immune system and elevated levels of immunoglobin related to toxic
molds.  He instructed Mrs. Freeman to stay out of the environment where she was exposed to the
toxic molds and prescribed IVIG infusion treatments.

In making its decision regarding medical necessity, Aetna received Mrs. Freeman's
medical records and treatment notes from Dr. Campbell.  A registered nurse employed by Aetna,
Lisa Odom ("Ms. Odom"), reviewed Dr. Campbell's treatment notes and opined that most of the

treatments and associated services for Mrs. Freeman were not medically necessary.  Thus, Aetna, "acting as fiduciary solely for benefit determination under ERISA" and in accordance with its "authority to make determinations on behalf of [Defendant] with respect to benefit payments under the Plan," denied certain of Dr. Campbell's claims.

In letters dated May 7 and June 17, 2002, respectively, Mrs. Freeman and Dr. Campbell appealed Aetna's decision to deny benefits associated with the services and treatments provided by Dr. Campbell.  All related medical records were provided to Dr. Buckman for review.  After analyzing Mrs. Freeman's medical records, Dr. Buckman, a licensed physician who is board-certified in internal medicine, concurred with Ms. Odom's conclusion that the diagnostic services and IVIG treatments were not medically necessary.  Specifically, Dr. Buckman concluded that "[t]he clinical information provided does not appear to warrant the diagnostic services, as well as intravenous immunoglobulin [treatments]."

Mrs. Freeman again appealed Aetna's decision denying her benefits.  Aetna responded by requesting an independent medical consultant, Dr. Holtzmuller, to review for medical necessity the diagnostic tests and IVIG treatments provided to Mrs. Freeman.  Dr. Holtzmuller, who is board-certified in internal medicine and gastroenterology, opined that Mrs. Freeman's symptoms were attributed to mold in the workplace and that she should stay out of the environment where she was exposed to the toxic molds.  Dr. Holtzmuller indicated that "[t]he standard of care for the treatment of mold exposure is eliminating the source of mold that is causing the exposure in the indoor environment (e.g., cleaning mold contaminants from humidifiers, air duct systems, and vaporizers) and eliminating dampness in that environment . . . ."  Further, Dr. Holtzmuller's Peer Review Analysis notes that "[m]old hypersensitivity could have been evaluated with skin testing."

Dr. Holtzmuller concurred with Dr. Buckman that a limited number of blood studies were warranted to evaluate Mrs. Freeman's purported physical ailments.  Dr. Holtzmuller concluded, however, that there was "no indication to proceed with sophisticated studies of her immune system" and that "[m]any of the blood studies were also not medically necessary."

In Dr. Holtzmuller's analysis of the medical necessity of the diagnostic tests and IVIG treatments, he reviewed each test individually and found as follows:

| DATE | TEST(S) ADMINISTERED BY DR. CAMPBELL | MEDICALLY UNNECESSARY | MEDICALLY NECESSARY |
|---|---|---|---|
| August 9, 2001 | 27 | 19 | 8 |
| December 10, 2001 | 15 | 12 | 3 |
| December 13, 2001 | 8 | 6 | 2 |
| February 7, 2002 | 1 | 0 | 1 |
| April 10, 2002 | 17 | 15 | 2 |
| TOTAL | 68 | 52 | 16 |

Dr. Holzmuller surmised that "[m]ost of the diagnostic testing was not medically necessary." Indeed, according to the above chart, approximately 76% of the tests were, in Dr. Holzmuller's determination, medically unnecessary.  Additionally, he stated that "[t]here was no medical necessity for the IVIG therapy" because "Chronic Sporanox therapy and IVIG administration are not accepted therapy for mold exposure and hypersensitivity."  Finally, Dr. Holtzmuller determined that "[Dr. Campbell] has provided neither sufficient documentation of his clinical findings nor sufficient documentation to support his treatment plan."

A third physician, Dr. Robbins, conducted a peer review of the growing file associated with Mrs. Freeman's claims, which included Dr. Holtzmuller's findings and conclusions.  Like Dr. Holtzmuller, Dr. Robbins determined that some of the testing was eligible for reimbursement. As such, Aetna paid those claims in connection with the testing and evaluation of Mrs. Freeman

that it deemed to be medically necessary.  A majority of the treatments and services, however, were deemed to be medically unnecessary.  Dr. Robbins stated that "[t]here is minimal or no elaboration of the clinical history, specifically the course of the symptoms, what evaluations have already been done, what workup has been done, or what treatments have been tried." Particularly, Dr. Robbins concluded that a majority of the tests, studies, and treatments, including the IVIG treatments, were not eligible for reimbursement.  Further, Dr. Robbins maintained that many of the "studies were unnecessarily repeated and the treatments were not indicated [to be] based on the clinical information presented [in the administrative record]."  Consequently, Aetna again upheld its denial of Dr. Campbell's claims for reimbursement for Mrs. Freeman's treatments and services.

Dr. Campbell also argues that Aetna automatically denied benefits for expenses associated with his examinations of Mrs. Freeman and for blood studies of her immune system solely because Aetna had developed a bias against him for prescribing IVIG treatments.  Further, he contends that Aetna "had no desire or intention of paying the extremely high price of IVIG therapy, and used this as a reason to deny Dr. Campbell's examinations and blood studies as not medically necessary."

Defendant recognized that just because a particular medication or medical therapy, such as IVIG infusions, prescribed by a physician is not covered under the Medical Plan, it does not automatically mean that all associated doctor's office visits, examinations, and tests are not covered.  In light of this acknowledgment, Aetna paid the claims it deemed medically necessary in accordance with the provisions of the Medical Plan.  The Chevron Plan maintains that Aetna denied Dr. Campbell's claims based upon extensive and independent reviews by a registered nurse

32

and three licensed physicians.  The conclusions reached as a result of the four medical reviews differed from Dr. Campbell's determination that the testing and treatment were medically necessary, lending support to Aetna's denial of benefits.  Aetna did not abuse its discretion by denying claims based upon independent examinations which disagreed with Dr. Campbell's assessment.  *See Salley*, 966 F.2d at 1015; *see also Black & Decker Disability Plan*, 538 U.S. at 831; *Meditrust Fin. Servs. Corp.*, 168 F.3d at 215 n.7; *Alcorn*, 991 F. Supp. at 617.  Hence, because there was ample, concrete evidence in the record in support of its position, Aetna did not abuse its discretion in determining Mrs. Freeman's treatments to be medically unnecessary and denying the payment of medical benefits.

III.    Conclusion

       After reviewing the information contained in the administrative record, the court cannot conclude that Aetna's decision to deny benefits for certain diagnostic services and IVIG treatment was an abuse of discretion.  Here, the administrative record reflects that the Chevron Plan, through Aetna, gave full and fair consideration to the available evidence and rendered a decision that comports with the explicit provisions of the Medical Plan.  Defendant's actions are supported by substantial evidence and cannot be deemed arbitrary or capricious.  Therefore, the Chevron Plan is entitled to summary judgment on all claims asserted by Dr. Campbell.  Accordingly, Defendant the Chevron Plan's Motion for Summary Judgment is granted.

       SIGNED at Beaumont, Texas, this 15th day of August, 2006.

                                        *Marcia A. Crone*
                              _____
                                    MARCIA A. CRONE
                              UNITED STATES DISTRICT JUDGE
                                          33